J-S02034-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

IN THE INTEREST OF: R.L., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
:
:
:
:
:
APPEAL OF: E.L., FATHER : No. 1589 MDA 2019

Appeal from the Order Entered August 22, 2019
in the Court of Common Pleas of Franklin County
Juvenile Division at No(s): 39 Adopt 2019,
40 Adopt 2019, 41 Adopt 2019,
42 Adopt 2019, 43 Adopt 2019,
44 Adopt 2019, 45 Adopt 2019,
CP-28-DP-0000072-2016, CP-28-DP-0000073-2016,
CP-28-DP-0000075-2016, CP-28-DP-0000076-2016,
CP-28-DP-0000077-2016, CP-28-DP-0000078-2016,
CP-28-DP-0000079-2016

IN RE: ADOPTION OF: R.E.L., A : IN THE SUPERIOR COURT OF
MINOR : PENNSYLVANIA
:
:
:
:
:
:
:
:
APPEAL OF: E.L., FATHER : No. 1590 MDA 2019

Appeal from the Decree Entered August 22, 2019
in the Court of Common Pleas of Franklin County
Orphans' Court at No(s): 39-ADOPT-2019

IN THE INTEREST OF: K.L., A MINOR  :    IN THE SUPERIOR COURT OF
:            PENNSYLVANIA
:
:
:
:
:
:
:
APPEAL OF: E.L., FATHER        :        No. 1591 MDA 2019
:

Appeal from the Order Entered August 22, 2019
in the Court of Common Pleas of Franklin County
Juvenile Division at No(s):  CP-28-DP-0000073-2016

IN RE: ADOPTION OF: K.M.L., A   :    IN THE SUPERIOR COURT OF
MINOR                   :            PENNSYLVANIA
:
:
:
:
:
:
:
APPEAL OF: E.L., FATHER        :        No. 1592 MDA 2019

Appeal from the Decree Entered August 22, 2019
in the Court of Common Pleas of Franklin County
Orphans' Court at No(s):  40-ADOPT-2019

IN THE INTEREST OF: D.L., A MINOR  :    IN THE SUPERIOR COURT OF
:            PENNSYLVANIA
:
:
:
:
:
:
:
APPEAL OF: E.L., FATHER        :        No. 1593 MDA 2019

Appeal from the Order Entered August 22, 2019
in the Court of Common Pleas of Franklin County
Juvenile Division at No(s):  CP-28-DP-0000075-2016

J-S02034-20

| IN RE: ADOPTION OF: D.L.L, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.L., FATHER | : | No. 1594 MDA 2019 |

Appeal from the Decree Entered August 21, 2019
in the Court of Common Pleas of Franklin County
Orphans' Court at No(s):  41-Adopt-2019

| IN THE INTEREST OF: A.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.L., FATHER | : | No. 1595 MDA 2019 |

Appeal from the Order Entered August 22, 2019
in the Court of Common Pleas of Franklin County
Juvenile Division at No(s):  CP-28-DP-0000076-2016

| IN RE: ADOPTION OF: A.N.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.L., FATHER | : | No. 1596 MDA 2019 |

Appeal from the Order Entered August 21, 2019
in the Court of Common Pleas of Franklin County
Orphans' Court at No(s):  45-ADOPT-2019

- 3 -

J-S02034-20

IN THE INTEREST OF: T.L., A MINOR  :  IN THE SUPERIOR COURT OF
  :  PENNSYLVANIA
  :
  :
  :
  :
  :
  :
APPEAL OF: E.L., FATHER  :  No. 1598 MDA 2019

Appeal from the Order Entered August 22, 2019
in the Court of Common Pleas of Franklin County
Juvenile Division at No(s):  CP-28-DP-0000077-2016

IN RE: ADOPTION OF: T.O.L., A  :  IN THE SUPERIOR COURT OF
MINOR  :  PENNSYLVANIA
  :
  :
  :
  :
  :
  :
  :
APPEAL OF: E.L., FATHER  :  No. 1599 MDA 2019

Appeal from the Decree Entered August 22, 2019
in the Court of Common Pleas of Franklin County
Orphans' Court at No(s):  44-ADOPT-2019

IN THE INTEREST OF: E.L., A MINOR  :  IN THE SUPERIOR COURT OF
  :  PENNSYLVANIA
  :
  :
  :
  :
  :
  :
APPEAL OF: E.L., FATHER  :  No. 1600 MDA 2019

Appeal from the Order Entered August 22, 2019
in the Court of Common Pleas of Franklin County
Juvenile Division at No(s):  CP-28-DP-0000078-2016

- 4 -

J-S02034-20

| | | |
|---|---|---|
| IN RE: ADOPTION OF: E.L.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.L., FATHER | : | No. 1602 MDA 2019 |

Appeal from the Decree Entered August 22, 2019
in the Court of Common Pleas of Franklin County
Orphans' Court at No(s):  43-ADOPT-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: W.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.L., FATHER | : | No. 1603 MDA 2019 |

Appeal from the Order Entered August 22, 2019
in the Court of Common Pleas of Franklin County
Juvenile Division at No(s):  CP-28-DP-0000079-2016

| | | |
|---|---|---|
| IN RE: ADOPTION OF: W.A.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.L., FATHER | : | No. 1605 MDA 2019 |

Appeal from the Order Entered August 21, 2019
in the Court of Common Pleas of Franklin County
Orphans' Court at No(s):  42-ADOPT-2019

BEFORE:  BENDER, P.J.E., KING, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    FILED MARCH 18, 2020

- 5 -

E.L. ("Father") appeals from the Decrees and Orders granting the Petitions filed by Franklin County Office of Children and Youth Services ("CYS"), involuntarily terminating Father's parental rights to his children with K.S.L. ("Mother"): R.E.L./R.L. (born in July 2006); K.M.L./K.L. (born in May 2007); D.L.L./D.L. (born in November 2008); W.A.L./W.L. (born in November 2009); E.L.L./E.L. (born in June 2013); T.O.L./T.L. (born in March 2015); and A.N.L./A.L. (born in October 2016) ("Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and changing Children's permanency goals to adoption pursuant to 42 Pa.C.S.A. § 6351.[1, 2]

In its Opinion, the trial court set forth the factual background and procedural history of this appeal, which we adopt herein. See Trial Court Opinion, 10/17/19, at 2-17.

On July 12, 2019, CYS filed Petitions to terminate the parental rights of Father to Children, and, on July 19, 2019, CYS filed Petitions for permanency

_____

[1] On August 21, 2019, the trial court also entered Decrees involuntarily terminating Mother's parental rights, but she has not filed a brief in the instant appeal or any appeal from the termination Decrees or permanency review Orders.

[2] Father and Mother have an eighth child, L.A.L., who resides with Father's mother and is not a subject of this appeal.

review hearings regarding Children.[3] The trial court held evidentiary hearings on the Petitions on August 19-20, 2019, at which Father and Mother were present, along with their counsel, and all legal counsel and the GAL for Children. On August 22, 2019, the trial court entered termination Decrees and goal-change Orders. On September 18, 2019, Father timely filed Notices of Appeal, along with Concise Statements pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father raises two issues:

[1. Whether, i]n the Adoption Docket, the trial court abused its discretion in terminating the parental rights of Father where he had not evidenced a settled purpose of relinquishing his parental claim to the [C]hildren[,] and he was unfairly penalized by his employment as an interstate over[-]the[-]road truck driver that made it impracticable for him to complete some of the required services to achieve reunification[?]

[2. Whether, i]n the Juvenile Docket, the trial court abused its discretion in changing the permanency goal to adoption where Father's employment as an interstate over[-]the[-]road truck driver that [sic] made it impracticable for him to complete some of the required services to achieve reunification[?]

Father's Brief at 5.

In his first claim, Father argues that the trial court erred and abused its discretion because CYS failed to prove that the requirements of 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8) were satisfied, and there was no evidence to

_____

[3] The trial court appointed Attorney Kristen Hamilton to represent all Children as guardian ad litem ("GAL") and as legal counsel for T.O.L. and A.N.L.; Attorney Ann Rotz as legal counsel for R.E.L., K.M.L., D.L.L., and E.L.L.; and Attorney Barbara Townsend as legal counsel for W.A.L.

show he had a settled purpose of relinquishing his parental rights. See Father's Brief at 12-15. Father asserts that the trial court abused its discretion in finding that he had minimally complied with the permanency plan for the family; made no progress toward alleviating the circumstances that necessitated Children's original placement; and, due to his work schedule, continued to present Mother as the primary caregiver. Id. Father contends that the trial court unfairly penalized him for his employment as an interstate over-the-road truck driver, which made it impracticable for him to complete some of the required services to achieve reunification. Id. at 12, 14.

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As we discussed in [In re: R.J.T., 9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. R.J.T., 9 A.3d at 1190. Therefore, even where the facts

could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

In re Adoption of S.P., 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

In its Opinion, the trial court set forth the relevant law and cogently addressed Father's claims. See Trial Court Opinion, 10/17/19, at 18-27, 30-32. Our review of the record reflects that the trial court's decision to terminate the parental rights of Father under sections 2511(a)(1), (2), (5), (8) and (b)[4] is supported by competent, clear and convincing evidence. See Adoption of S.P., supra. We therefore adopt the sound reasoning of the trial court for the purpose of this appeal, and affirm on this basis. See Trial Court Opinion, 10/17/19, at 18-27, 30-32.

In his second claim, Father incorporates the points he set forth in his first argument, and reiterates that he was unfairly penalized due to the nature of his employment as an interstate over-the-road truck driver. See Father's Brief at 14-15.

_____

[4] Father does not raise section 2511(b) in the statement of questions involved in his brief. See Krebs v. United Refining Co. of Pa., 893 A.2d 776, 797 (Pa. Super. 2006) (stating that any issue not set forth in or suggested by an appellate brief's statement of questions involved is deemed waived). We, nevertheless, agree with the trial court's disposition of section 2511(b).

- 9 -

The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. We review for abuse of discretion.

In Interest of: L.Z., A Minor Child, 111 A.3d 1164, 1174 (Pa. 2015) (citation and quotation marks omitted).

In its Opinion, the trial court set forth the relevant law and cogently addressed Father's claims. See Trial Court Opinion, 10/17/19, at 27-30, 30-32. Our review of the record reflects that the trial court's decision to change the Children's permanency goal to adoption is supported by competent, clear and convincing evidence. See id., supra. We therefore adopt the sound reasoning of the trial court for the purpose of this appeal, and affirm on this basis. See Trial Court Opinion, 10/17/19, at 27-30, 30-32.

Decrees and Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/18/2020

RECEIVED OCT 1 8 2019

# IN THE COURT OF COMMON PLEAS OF THE 39ᵀᴴ JUDICIAL DISTRICT OF PENNSYLVANIA – FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| In re: ADOPTION OF | : | Orphans' Court Division |
| | : | |
| R.E.L., a minor<br>Date of Birth: 07/04/2006 | : | No. 39-ADOPT-2019 |
| | : | |
| K.M.L., a minor<br>Date of Birth: 05/03/2007 | : | No. 40-ADOPT-2019 |
| | : | |
| D.L.L., a minor<br>Date of Birth: 11/10/2008 | : | No. 41-ADOPT-2019 |
| | : | |
| W.A.L., a minor<br>Date of Birth: 11/17/2009 | : | No. 42-ADOPT-2019 |
| | : | |
| E.L.L., a minor<br>Date of Birth: 06/20/2013 | : | No. 43-ADOPT-2019 |
| | : | |
| T.O.L., a minor<br>Date of Birth: 03/09/2015 | : | No. 44-ADOPT-2019 |
| | : | |
| A.N.L., a minor<br>Date of Birth: 10/19/2016 | : | No. 45-ADOPT-2019 |

| | | |
|---|---|---|
| In the Interest of | : | Juvenile Division |
| R.L., a minor<br>Date of Birth: 07/04/2006 | : | No. CP-28-DP-0000072-2016 |
| | : | |
| K.L., a minor<br>Date of Birth: 05/03/2007 | : | No. CP-28-DP-0000073-2016 |
| | : | |
| D.L., a minor<br>Date of Birth: 11/10/2008 | : | No. CP-28-DP-0000075-2016 |

OCT 17 2019
ATTEST: A TRUE COPY

Clerk of Courts

1

| | | |
|---|---|---|
| W.L., a minor | : | No. CP-28-DP-0000079-2016 |
| Date of Birth: 11/17/2009 | : | |
| | : | |
| E.L., a minor | : | No. CP-28-DP-0000078-2016 |
| Date of Birth: 06/20/2013 | : | |
| | : | |
| T.L., a minor | : | No. CP-28-DP-0000077-2016 |
| Date of Birth: 03/09/2015 | : | |
| | : | |
| A.L., a minor | : | No. CP-28-DP-0000076-2016 |
| Date of Birth: 10/19/2016 | : | |

## Opinion *sur* Pa.R.A.P. 1925(a)

Before the Court are seven Children's Fast Track Appeals initiated by the Notices of Appeal and Concise Statements of Matters Complained of on Appeal filed September 18, 2019, by E.L. ("Father"). Father seeks review of this Court's Decree, entered August 21, 2019, terminating his parental rights to R.E.L., K.M.L., D.L.L., W.A.L., E.L.L., T.O.L., and A.N.L., his minor children (hereinafter referred to as "the children"). Also before this Court are seven Notices of Appeal and Concise Statements of Matters Complained of on Appeal challenging this Court's Order entered August 21, 2019, after a Permanency Review hearing, changing the goal from reunification to adoption. As no error occurred, this Court respectfully requests that its determinations be affirmed.

2

## STATEMENT OF THE CASE

E.L. ("Father") and K.S.L. ("Mother") are the parents of seven minor children ranging in age from two to thirteen. On July 12, 2019, Franklin County Children & Youth Services filed a Petition for Involuntary Termination of Parental Rights, seeking to terminate both Mother's and Father's parental rights to their seven children pursuant to 23 Pa.C.S. §2511(a)(1), (2), (5), and (8).

This Court convened a hearing on the Petition on August 19th and 20th, 2019. Concurrently, a Permanency Review Hearing in the interest of the children was held before the Court. Both Father and Mother were present with their respective attorneys. In addition, Attorney Kristen Hamilton, Guardian Ad Litem ("GAL") for all the children and legal counsel for T.O.L and A.N.L., Attorney Ann Rotz, legal counsel for R.E.L., K.M.L., D.L.L., and E.L.L., and Attorney Barbara Townsend, legal counsel for W.A.L., were present for the above-mentioned proceedings.

This Court issued a Decree dated August 21, 2019, terminating both Father's and Mother's parental rights and awarding custody of the children to Franklin County Children and Youth Service. Also based on the evidence presented at the hearing, this Court entered Orders in the dependency matters changing the permanency goal from reunification to adoption. Father filed a Notice of Appeal of a Children's Fast Track Appeal under Pa.R.A.P. 102, along with a Concise

3

Statement of Matters Complained of on Appeal for each of the above-captioned cases, on September 18, 2019, to which this Court now responds.[1]

## FACTUAL FINDINGS

In May 2012, the parents' five children at the time were removed from their physical and legal custody by Washington County Department of Social Services in Maryland, and were thereafter placed in the care of their grandmother, Dr. L. Though the children were returned to the care of their parents in early June of that year, the children were once again removed less than two weeks later. In the following months, four of the children were returned to the care of Father and Mother, though one has remained in the care of her grandmother throughout.

Franklin County Children and Youth Services ("CYS") received a referral concerning the family in this matter on June 13, 2015. Specifically, CYS was notified Mother's father was responsible for taking care of six children, and there were concerns about the supervision and hygiene of the children. The case was closed after brief intervention by CYS.

On August 24, 2016, CYS intervened again after another referral, this time regarding the condition of the home. In response, CYS conducted a home visit and found dog feces throughout the home. Following the visit, CYS advised Mother of the safety and hygiene concerns, and Mother expressed Father was frequently

---

[1] Mother did not appeal our determinations in either the Orphans' Court or Juvenile Court matters.

unavailable due to his employment, leaving her feeling overwhelmed and in need of in-home support from her father. This case was closed two days later after another home visit revealed a cleaner home and adequate support from Mother's father.

CYS received a third referral on October 4, 2016, this time regarding the care of the children. When CYS again visited the home, they encountered a strong odor throughout the house and signs of feces residue on the floors. Two weeks later, during another home visit, the agency found dog feces in most of the bedrooms. The following day, CYS received yet another referral, with concerns for the condition of the children and the home, the relationship between Father and Mother, and the family's previous encounters with Social Services in two other counties.

At the same time, Mother gave birth to a seventh child, A.N.L., and a referral was made to CYS stating she planned to give the child up for adoption. CYS was made aware during a hospital visit that the parents were unprepared to raise a newborn, as they were lacking several basic necessities, including diapers, formula, a working crib, and a car seat; however, Mother assured CYS she had help from her father in raising the seven children. She made clear Father was rarely home and was unable to take time off work to help her in the home.

An unannounced home visit was conducted immediately thereafter and a strong odor of urine was immediately sensed. CYS found dog feces throughout the home, as well as human feces in one bedroom. Specifically, feces were discovered smeared on the inside of the 18-month-old's crib and the bathroom floors, stained on the carpets throughout the home, and scattered in piles of clothing. In addition, there was mold growing in the refrigerator and urine soaking in the mattresses. Even further, CYS observed a rash and swelling on T.O.L.'s (the 18-month-old's) leg, which also felt warm to the touch. For these reasons, CYS obtained an Order for Emergency Protective Custody the same day and placed the children in the temporary custody of the agency. Thereafter the children received medical assessment where it was discovered that two of the children had contracted scabies.

On May 9, 2017, an Adjudication and Disposition Hearing was held after which the children were adjudicated dependent and ordered to remain in the legal and physical custody of CYS. Because of this determination, Father was required to comply with the recommendations of his parental fitness assessment; obtain and maintain financial stability; obtain and maintain stable housing; and participate in frequent and consistent visitation with the children to build and/or maintain the parent/child relationship. The evidence presented at the hearing held August 19-20, 2019, convinces us that Father has failed to comply with the court-ordered requirements for reunification.

Dr. Bernadette Cachara completed a joint parental fitness assessment of Father and Mother on November 14, 2016, and made several recommendations: (1) that Father participate in a full psychological evaluation; (2) that visits be limited to fewer than all the children to better ensure the children's safety; (3) that Father participate in marital counseling with Mother; (4) that the five older children be evaluated to determine how they are affected by their parents' actions and whether future therapeutic services are necessary; and (5) that Father undergo intensive parenting services with Mother, but only after each parents' mental health needs were addressed.[2]

Father did participate in the psychological evaluation as recommended, but subsequently failed to complete any of the recommendations. After a joint psychological evaluation performed by Jacqueline B. Sallade, Ed.D., Dr. Sallade recommended Father participate in individual outpatient counseling. Father did not complete individual outpatient counseling, and as a result, has failed to adequately address the areas of concern. Moreover, though Dr. Sallade, like Dr. Cachara, also recommended Father and Mother participate in marital counseling, they have failed

---

[2] Dr. Cachara concluded "the high level of emotion as well as the inability to modulate their emotions is likely detrimental to the children. Neither [parent has] the insight necessary to understand the impact of their mood and emotional outbursts on the children." Decree, at ¶9t.

to consistently do so.[3] In fact, Father has not participated in individual or marital counseling since September 2017.

Second, Father has not maintained stable housing suitable for his children. In December 2016, the parents were evicted from their rental home in Chambersburg, Pennsylvania. While in the process of moving out, Mother refused to notify CYS of the location of their new residence until the children were returned to her care. In an attempt to gather more information, CYS unsuccessfully tried to contact the parents by telephone, and eventually resorted to showing up during the parents' visit at the supervised visitation provider. After some back-and-forth, Mother eventually admitted she and Father were staying at the Days Inn in Chambersburg, Pennsylvania following their eviction.

In January 2017, Father and Mother moved into a new rental home in Shippensburg, Pennsylvania, which appeared satisfactory upon a visit by CYS; however, in November 2017, they were evicted from that home. From then until May 2019, the cycle of moving and eviction occurred twice more. CYS was not notified of the final eviction, nor were they given the parents' new address. CYS made several attempts to contact Father and Mother regarding this issue, but their attempts were not met with honesty and forthcoming information.

---

[3] Father, in late 2017, blamed his work schedule on his inability to follow through with the recommendations for both individual and marital counseling.

8

CYS's attempts to schedule home and office visits with Father and Mother were similarly futile. While CYS was not been provided information from the parents regarding their housing situation, it appeared at the time of the hearing the parents, as well as their two dogs, were living in the cab of Father's tractor-trailer.

Father has also failed to demonstrate financial stability and the ability to provide for his children's needs. At the time of the children's placement, Father was employed as a truck driver with Abeline Trucking, which caused him to be away from the home for days, weeks, or even months at a time. He subsequently left Abeline Trucking in order to provide more assistance in the home. He went to work for Chambersburg Waste Paper on November 3, 2018. Father left Chambersburg Waste Paper less than two months later for employment with JB Hunt Trucking Company.

At the hearing Father provided information to the Court regarding his current employment as a tractor-trailer owner/operator and subcontractor. Based on the documentation he provided, it is unclear if his compensation is sufficient to meet his family's financial needs.

Father has not maintained consistent visitation with the children over the course of their time in placement and has not demonstrated progress in learning and implementing the skills taught by the intensive parenting education. At the TPR Hearing, Emilee Bakner ("Ms. Bakner"), Director of the Franklin County

Center of Alternative Behavioral Consultants ("Chambersburg ABC"), testified credibly to the services provided to Mother and Father and the observations and recommendations that followed.[4]

Chambersburg ABC completed the parents' Fast Assessment[5] and provided STEPS[6] visitation and SKILLS[7] services to the parents.[8] From the assessment, the center concluded there were concerns as far as the parents' mental health, the safety and supervision of the children, the parents' ability to positively discipline the children, and the parents' engagement and nurturance.

Ms. Bakner testified Father and Mother participated in the first set of STEPS visits from November 6, 2016, to December 12, 2016. Following this first set of STEPS visits, Chambersburg ABC recommended the parents participate in SKILLS "in order to gain the knowledge and effective parenting techniques in order to maintain safety and security for the children." T.P.R. Hearing, at 12.

---

[4] As Director of the Chambersburg ABC Center, Ms. Bakner was personally involved in the services provided to Father and Mother, specifically by directly supervising the parent educators and parent supervisors charged with implementing the programs and by discussing the case periodically with the staff throughout the programs. Further, Ms. Bakner personally did the observations for the Parental Fitness Assessment and participated in some of the visitations that occurred.

[5] A parental fitness assessment designed to determine the areas requiring attention and improvement and to assess where in the program the parents should begin.

[6] According to Ms. Bakner's testimony, the STEPS program refers to general supervised visitation provided by ABC.

[7] The SKILLS program, on the other hand, encompasses the intensive parenting education and implementation services provided by ABC.

[8] The Parental Fitness Assessment is designed to determine the areas requiring attention and improvement and to assess where in the program the parents should begin.

However, the SKILLS program, which typically runs for 90 days, was cut short, and Father and Mother were discharged early due to emotional and mental health concerns interfering with their ability to fully participate in the program. Ms. Bakner explained both parents had difficulty taking direction from the Chambersburg ABC staff, and there were "a lot of arguments as far as when [they] were trying to help teach them particular skills." T.P.R. Hearing, at 13. While Mother's emotional outbursts were the primary concern during that period, Ms. Bakner stated Father exhibited signs of anger and disagreement with the program at times, as well.

Since the April 2017, discharge from ABC, Father and Mother participated in only one visit, and that visit was with only two of the seven children. CYS's attempts to schedule visits with the other five children were not met with cooperation. After the May 9, 2017 hearing, CYS referred the family to Central PA Family Supports and Children's Aid Society to provide more opportunities for visitation, but because of the parent's difficulty in cooperating, the first visit with four of the children did not occur until the end of June, 2017. For a few months, the parents participated consistently and appropriately with visits, so in August, 2017, Chambersburg ABC attempted to re-initiate STEPS visits with Father and Mother; the center, however, found it difficult to accommodate their schedules.

11

Father, in particular, was unavailable much of the time, due to his work schedule. Ms. Bakner indicated she understood Father was employed as a truck driver and therefore was not always able to make the visits. Although the center made efforts to work around Father's schedule, he only showed up for one visit during that period. Further, the center declined the parents' request to move the visits to their home since they were unable to confirm the parents' consistent participation in mental health treatment as was required.

The final period of STEPS visitation spanned from August 2, 2017, to March 28, 2018, when it was once again terminated due to the parents being discharged from the program.[9] This time, they were discharged "due to angry and emotional outbursts towards the foster parent and toward—in the center as a whole." T.P.R. Hearing, at 19. Ms. Bakner testified regarding the incident leading to the discharge which involved both parents.[10]

---

[9] Father and Mother participated in visitation with three of their children through the STEPS program offered by ABC and with the other four children through Central PA Family Support at this time. However, they "often scheduled visits at the last minute and did not take advantage of visits as often as they were offered." Decree, at ¶9kkkk. Of the six visits with the four oldest children from August 2, 2017, through March 28, 2018, Father only appeared at two of them.

[10] She described how the parents arrived at the center that day, and, before the staff could notify them the conference room in the center had been reserved for them to have for dinner, they began to run around the center, slamming things and voicing their dissatisfaction with the size of the table they assumed would be the dinner table during the visit. Ms. Bakner further testified to a verbal confrontation between Father and the foster parent that occurred when the foster parent arrived with the children that day; this altercation occurred as a result of the children arriving two to three minutes late. In addition, while things calmed down for a bit after the center's staff warned the parents about their behavior, tempers flared up once again towards the end of the visit. As stated above, after this incident, STEPS visits were terminated and the parents have not returned to Chambersburg ABC since.

12

The inconsistency in visitation and in following through with the recommended services has had a detrimental effect on Father's parenting ability. When asked if there were any areas of parenting that did not require improvement, Ms. Bakner could not identify any. In fact, she credibly testified, based on the staff's observations throughout the process, the parents required assistance in all areas. Further, though Chambersburg ABC provided services on-and-off to Father and Mother for about a year-and-a-half, Ms. Bakner observed that the only thing the parents improved upon during that time was their ability to provide food for the children during visits.

In general, Ms. Bakner testified there were safety concerns for the children, both physically and emotionally. She repeatedly emphasized the emotional outbursts and anger exhibited by the parents, and cited such as the main obstacle to reunification at that time – in her opinion. She stated there was a lot of cursing, from Father more than Mother, directed mainly at the staff, which took place in front of the children at times. As far as physical safety concerns, Ms. Bakner described the difficulty the parents had in keeping track of all the children, which led to close calls, especially with A.N.L., the youngest child. Specifically, she recounted numerous times where A.N.L., who was only a month old, was simply laid on the floor in the middle of the room while the other children ran around her;

13

Ms. Bakner additionally highlighted the parents' difficulty keeping track of all the children during the bathing routine.

Ms. Bakner also testified about the parents' difficulty in demonstrating nurturing behaviors toward the children.[11] Ms. Bakner observed that the children wanted to please their parents and vied for their attention; yet, the children's enthusiasm was often not reciprocated by the parents. Instead, the parents often "cut off" or "dismissed" the children, to the point the staff could visibly see a reaction from the children; Ms. Bakner described these interactions as "crushing." T.P.R. Hearing, at 52.

In addition, there were concerns about the parents' relationship with each other. Ms. Bakner explained Father and Mother would vacillate between wanting to parent together and wanting to parent separately because of marital difficulties. Chambersburg ABC recommended they go to marital counseling due to the obstacles in communication, but as discussed above, they failed to consistently do so. Further, though the Court heard testimony indicating Father's presence calmed Mother and stopped her emotional outbursts, it was suggested multiple times that this was due to intimidation and the demands he made to Mother, above anything else.

---

[11] In particular, she described the noticeable lack of attention given to W.A.L. by both parents during visitation. Even when W.A.L. specifically indicated to Father that he wanted help with his homework, and the center's staff told Father they could provide the materials necessary to complete the homework, Father told W.A.L. to do the homework with his foster family instead.

14

After the final discharge from Chambersburg ABC, Carlisle ABC provided services to Father and Mother for a brief period before they were similarly discharged from that center. Kim Sweger ("Ms. Sweger"), the executive director of Carlisle ABC and the individual responsible for supervising the staff, credibly testified about Carlisle ABC's interactions with, and observations of, Father and Mother throughout the process.[12]

Carlisle ABC provided STEPS visitation periodically from November 2018, to the time of the hearing in August 2019, as well as one SKILLS session on April 27, 2019. Though CYS referred the family to Carlisle ABC in October 2018, visits were not able to actually begin until December, 2018, because of numerous no-shows by the parents.[13]

Ms. Sweger described an instance evidencing Father's. She stated he screamed at his wife with profanities and an angry tone outside the center on one occasion when his wife became emotional. She testified the neighbors, believing it to be a domestic incident, called either the police or someone in the agency to report the situation. Further, the center had to rearrange their staff members that morning to prevent the incident from affecting the other families coming into the center at the time.

---

[12] Ms. Sweger spoke on her high level of involvement with the family, explaining she personally created the plan and actually provided the services on behalf of Carlisle ABC.

[13] The parents were even sent reminders by text of the upcoming visitations, and although the children showed and waited on those occasions, the parents did not.

15

Similar to Chambersburg ABC's efforts, the Carlisle center attempted to accommodate Father's circumstances in scheduling the services. In fact, Ms. Sweger stated she was aware Father was employed as a truck driver, and since he indicated he would be available on weekends, she scheduled the SKILLS program for eight-hour windows on Saturdays and Sundays. However, for the one Saturday session that actually occurred before the parents were discharged, Father did not participate. The parents were even offered a hotel room in Carlisle to stay in during the weekends.

Though the center made these efforts to ease the process for the family, the Carlisle staff, too, was met with resistance and arguments about how the program was run; this led to more delays and eventually discharge from the program. Father's failure to maintain consistent visitation undoubtedly negatively impacted the children and impeded his ability to progress throughout the programs offered and recommended by ABC. In particular, Father was never able to make sufficient progress learning parenting skills because of the numerous discharges from both the STEPS and SKILLS programs. Additionally, Ms. Sweger, who observed Father in his parenting capacity most recently, testified she found the recommendations for psychological evaluation, outpatient individual counseling,

and marital counseling to be warranted, even in late April and early May of 2019, though he has not followed through on the recommendations.[14]

## ISSUES RAISED

In the Orphans' Court matters captioned above, Father challenges the Court's Order terminating his parental rights as not supported by clear and convincing evidence, and therefore constituting an abuse of discretion. He bases his claim on the following: (1) Father has not evidenced a settled purpose of relinquishing his parental claim to his child; and (2) Father was unfairly penalized by his employment as an interstate over-the-road truck driver that made it impracticable for him to complete some of the required services to achieve reunification.

In the Juvenile Court matters captioned above, Father claims the Court's decision to change the permanency goal from reunification to adoption was not supported by clear and convincing evidence, and therefore constituted an abuse of discretion. This allegation is also based on the claim he was unfairly penalized for his employment.

---

[14] We found Ms. Sweger's professional opinions to be highly persuasive, given her almost 25-year history of providing similar services to parents and children.

# DISCUSSION

## I.    Termination of Parental Rights

The standard of review in a termination of parental rights case is well established:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

In re S.H., 879 A.2d 802, 805 (Pa. Super. 2005) (citation omitted).

The petitioner has the burden to prove by clear and convincing evidence that the asserted grounds for seeking termination are valid in a termination of parental rights case. In re A.S., 11 A.3d 473, 477 (Pa. Super. 2010) (citation omitted). Our appellate courts have stated the following:

> The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result.

Id. (citations omitted).

Additionally, parental rights are not absolute: "[a] parent's basic constitutional right to the custody and rearing of ... [his] children is converted, upon the failure to fulfill ... parental duties, to the children's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." In re A.S., 11 A.3d at 478 (citation omitted). Parental rights may be involuntarily terminated where any one subsection of 23 Pa.C.S. § 2511(a) is satisfied. In re Z.P., 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted). "The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have his parental rights terminated." Id. at 1118 (citation omitted).

Here, we determined legal grounds existed supporting the involuntary termination of Father's parental rights under the following provisions: Sections 1511(a)(1), (2), (5), and (8). Termination under each legal ground was supported by clear and convincing evidence. We will now discuss each in turn.

## A. Termination of Parental Rights under Section 2511(a)(1)

Section 2511(a)(1) provides for termination in the following circumstances:

> The parent by conduct continuing for a period of at least six months immediately preceding the filing of the Petition either has evidenced a settled purpose of relinquishing parental claim to the child or has refused or failed to perform parental duties.

23 Pa.C.S. §2511(a)(1).

In his Concise Statement, Father alleges he has not evidenced a settled purpose to relinquish parental rights. We disagree.

The Petition was filed on July 12, 2019. As described in our factual findings at length above, in the six months preceding the filing of the Petition, Father refused to perform his parental duties thereby evidencing his settled purpose to relinquish his parental rights. Father failed to demonstrate stability in his housing and financial situation; he refused to cooperate with CYS and ABC in scheduling and maintaining consistent, meaningful, and nurturing visits with his children; and he failed to participate in services as recommended by the parental assessment and psychological evaluation such as individual counseling and marital counseling. This conduct lasted well over the six months immediately preceding the filing of the petition.

For these reasons, the Court did not err in terminating Father's parental rights under Section 2511(a)(1).

## B. Termination of Parental Rights under Section 2511(a)(2)

Section 2511(a)(2) sets forth the following grounds for termination:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

20

23 Pa.C.S. §2511(a)(2). It should be noted statutory grounds for termination of parental rights due to parental incapacity that cannot be remedied are not limited to affirmative misconduct; "[t]o the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." In re D.L.B., 166 A.3d 322, 327 (Pa. Super. Ct. 2017)(citation omitted).

Here, clear and convincing evidence exists to support a finding that Father's parental rights should be terminated under Section 2511(a)(2). Father has failed to demonstrate he is willing and able to provide a safe and secure home for his children. Father, also with Mother, has repeated the cycle of moving and eviction four times since the children's placement, evidencing a marked inability to provide a stable housing environment. Father withheld information regarding the parents' current living situation, though at the hearing Father and Mother testified that they, as well as their two dogs, currently reside in Father's tractor-trailer.

Notably, appellate courts in this Commonwealth have established:

> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and *strong, continuous parental ties,* which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

In re A.S., 11 A.3d 473, 478 (Pa. Super. Ct. 2010)(citing In re E.A.P., 944 A.2d 79, 82 (Pa. Super. Ct. 2008)). In making our determination, we considered the lack of safe and stable housing over time. The lack of meaningful, consistent, and nurturing visits with the children was also significant to our decision, as was Father's repeated failure to address his need for mental health services. Father has failed to demonstrate significant progress on any of the identified deficiencies and the Court is of the opinion the situation is unlikely to be remedied in the near future. Thus, the grounds for termination under Section 2511(a)(2) are supported by clear and convincing evidence.

## C. Termination of Parental Rights under Section 2511(a)(5), (8)

Section 2511(a)(5) outlines another basis for termination:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an Agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. §2511(a)(5).

Section 2511(a)(8) lays out the following as supporting involuntary termination of parental rights:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an Agency, 12 months or more have

22

elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parent rights would best serve the needs and welfare of the child.

23 Pa.C.S. §2511(a)(8).

Significantly, unlike Section 2511(a)(5), "termination under Section 2511(a)(8), does *not* require an evaluation of [parents'] willingness or ability to remedy the conditions that led to the placement of her children." In re Adoption of R.J.S., 901 A.2d 502, 511 (Pa. Super. Ct. 2006)(citing In re In the Interest of S.H., 879 A.2d 802, 807 (Pa. Super. Ct. 2005) and In re J.T. and R.T., 817 A.2d 505, 509 (Pa. Super. Ct. 2003)). Instead, Section 2511(a)(8) "requires only that the conditions continue to exist." R.J.S., 901 A.2d at 511.

The R.J.S. court relied heavily on its past holding in S.H. in determining the parent's appeal had no merit under Section 2511(a)(8), noting termination in S.H. was proper where "the evidence indicated that although S.H.'s parent was making progress, she would require another one or two years before conditions would be such that the return of her child to her custody could be contemplated." R.J.S., 901 A.2d at 511. Further, the court in S.H. emphasized the child "was eight-years-old and had spent half of her life in the custody of the child welfare agency," so the need for "permanence and stability" supported the termination of parental rights. Id. at 512.

Here, the children have been removed from Father's care and custody for over thirty-three months. As the above-discussed evidence establishes, Father has been, and remains, unable to provide the necessary permanence and stability for his children. Since the children have been placed, Father and Mother have been evicted from four different homes and now reside in the cab of Father's tractor-trailer, or in a motel "every now and again." T.P.R. Hearing, at 138. Father has failed to provide any sort of plan moving forward with regard to housing, either with or without the children. Father also failed to demonstrate financial stability since the children's placement, as he has refused to be forthcoming with information concerning his salary and hours, has been evicted four times, and is in arrears by thousands of dollars.

Moreover, Father has not participated in individual or marital counseling since September 2017, despite numerous recommendations and options to do so. We found this refusal highly indicative of his unwillingness and inability to remedy these issues in a reasonable amount of time.

Father's lack of consistent and nurturing visits with the children has been considered. Father's lack of progress in parenting skills, due primarily to the inability to remain in the intensive parenting education programs for a substantial amount of time, also persuaded this Court the circumstances mandating placement could not, or would not, be remedied in the foreseeable future.

24

For these reasons, this Court did not err in terminating Father's parental rights under Sections 2511(a)(5) and (8).

## A.    Termination of Parental Rights Under Section 2511(b)

If the Court finds the grounds for termination are satisfied pursuant to Section 2511(a), it must proceed to an evaluation of the child's best interests under Section 2511(b). Section 2511(b) provides the following:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b). In considering the needs and welfare of a child, the court must examine whether terminating the natural parent's rights would destroy something in existence that is necessary and beneficial. In re C.S., 761 A.2d 1197, 1202 (Pa. Super. 2000).

The evidence presented at the hearing convinces this Court that termination of Father's parental rights is in the children's best interests. As discussed above, Father failed over a period of thirty-three months to remedy the conditions which brought the children into care. During that time, the children's foster families have provided the children with safe and stable homes and have provided love,

25

guidance, and support necessary to meet their developmental, physical and emotional needs and welfare.

The children have the necessary support from their foster parents to assist them through any detriment or loss suffered as a result of our termination of Father's parental rights. The children have developed meaningful and appropriate parent-child bonds with their foster parents. The foster families are permanency resources.

Furthermore, terminating Father's parental rights would not destroy "something in existence that is necessary and beneficial." In re C.S., 761 A.2d at 1202. It is possible that Father and the children have a loving bond. However, Father's lack of engagement and unwillingness to cooperate with the agencies' requirements demonstrates his lack of appreciation and understanding of what he needs to do to meet his children's developmental, physical and emotional needs and welfare.

The children, whose ages range from two to thirteen, have spent most, or at least a substantial part, of their lives removed from their parents' care and custody. Even aside from the current placement, which has spanned over two years, the four older children were previously placed in the care of Washington County Department of Social Services twice in 2012 for the same reasons as the current placement. This Court is convinced that the love, comfort, security, and stability

the children have with their foster parents outweigh any existing emotional bond they have developed with Father.

Thus, this Court did not err in terminating Father's parental rights pursuant to Section 2511(b).

## II.    Goal Change from Reunification to Adoption

Father challenges this Court's decision to change the permanency goal from reunification to adoption, alleging the decision was unsupported by clear and convincing evidence, and was therefore an abuse of discretion. Father claims the Court unfairly penalized him for his employment as an over-the-road truck driver—employment which made it difficult for him to participate in some of the programs required for reunification.

The standard of review for a juvenile court's permanency determination is as follows:

> In cases involving a court's order changing the [court-ordered] goal ...
> to adoption, our standard of review is abuse of discretion. To hold that
> the trial court abused its discretion, we must determine its judgment
> was manifestly unreasonable, that the court disregarded the law, or
> that its action was a result of partiality, prejudice, bias or ill will.
> While this Court is bound by the facts determined in the trial court, we
> are not tied to the court's inferences, deductions and conclusions; we
> have a responsibility to ensure that the record represents a
> comprehensive inquiry and that the hearing judge has applied the
> appropriate legal principles to that record. Therefore, our scope of
> review is broad.

In Interest of L.T., 158 A.3d 1266, 1276 (Pa. Super. 2017) (citations omitted). In a change of goal proceeding, the interests of the child supersede the interests of the parent. In re D.P., 972 A.2d 1221, 1227 (Pa. Super. 2009) (citations omitted). The burden is on the Agency to prove the change in goal would be in the best interests of the child. Id. (citation omitted). A court must consider the following factors regarding permanency planning:

> Pursuant to § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months.

In Interest of L.T., 158 A.3d at 1276-1277 (citations omitted).

Here, this Court changed the children's permanency goal from reunification to adoption simultaneously with the termination of Father's parental rights.[15] The evidence presented at the hearing establishes that our changing of the children's permanency goal from reunification to adoption is in the children's best interests. Although Father complied with some of the directives of this Court, his compliance was neither complete nor sufficient to overcome the Agency's request

---

[15] Thus, this Court considered the same evidence for both matters.

for change of permanency goal. Father is in no position to have the children returned to his care in the foreseeable future.

Our decision was not based on what Father does for a living, as Father appears to believe, but rather, his demonstrated inability and unwillingness to remedy the circumstances which led to the children's placement from the beginning. The children deserve permanency and stability, and their lives should not be put on hold "in the hope that [Father] will summon the ability to handle the responsibilities of parenting." In re N.C., 909 A.2d 818, 824 (Pa. Super. 2006) (citation omitted).

This Court initially placed the children in the temporary legal and physical custody of CYS by Order dated October 31, 2016; the children were subsequently adjudicated dependent and ordered to remain in the custody of CYS on May 9, 2017. Thus, the children, at the time of the hearing, had been in placement for over thirty-three months.

Father has been given countless opportunities to address and remedy the issues preventing reunification and has been offered numerous services through which to improve parenting skills, visit his children, and remedy individual mental health and marital concerns. Time and time again, Father has refused to both cooperate and consistently participate. Father has also failed to provide the Court with a plan to remedy the financial and housing concerns. Thus, it is apparent

Father will not sufficiently remedy the conditions leading to the children's placement, even if provided more time, as he has failed to make significant improvements in any areas of concern.

On the other hand, the children's need for stability and safety is currently being met by their foster families.[16] Thus, this Court did not err by changing the children's permanency goal from reunification to adoption, because the change is necessary to achieve permanency.

### III. Father was not penalized by his employment as an over-the-road truck driver.

We do not agree that Father was unfairly penalized by his employment as an over-the-road truck driver despite his allegation that his employment made it "impractical" for his to complete some of the required services to achieve reunification. First and foremost, we do not accept that Father's employment, although necessary to maintain financial stability, can or should be an excuse for failing to meet his children's needs, period.

The evidence presented at the hearing also showed Mother was the primary caregiver of the children before placement. Father, on the other hand, was out of the home much of the time due to his employment. The Court heard testimony indicating Mother was believed to suffer from a personality disorder, as well as

---

[16] As of the hearing date, four of the children had resided together in a foster home for over two years, and the other three had resided together in a different foster home for even longer.

situational depression stemming from becoming overwhelmed in caring for the children alone.[17] The CYS caseworker, Gayle Schreiber, credibly testified Mother told her even when she needed more support at home and assistance in caring for their seven children, Father was unable to take time off and be home with the family.[18]

The fact that Father views his employment as paramount to his children's needs speaks to his lack of insight into his and his children's situation. If the children were otherwise well cared for with their physical and emotional needs met, their safety assured, and their developmental needs addressed in his home, we would not have had cause to scrutinize Father's employment. That said, Father cannot use his employment as an over-the-road long-haul truck driver as an excuse for failing to address the deficits in his parenting or failing to meet his children's needs. Father's employment cannot be a legitimate reason for failing to address marital and mental health issues or for failing to consistently visit with the children – especially when the providers were willing to accommodate Father's work schedule. Cooperating with CYS and the directives of the Juvenile Court may not

---

[17] At one point, there was even an incident where Mother took a picture of herself with one of Father's guns pointed at her head and sent it to Father while he was on the road. This incident occurred on September 16, 2018.

[18] Instead, Mother relied on her father to take care of the children when she could not; there were, however, many concerns with his ability to safely and adequately care for the children, and these concerns even led to a referral to CYS as discussed above. However, even though Father was out of the home much of the time and Mother struggled taking care of all the children, they failed to provide for a safe and appropriate child care alternative.

31

always be the easiest and most "practical" thing; however, some things are just necessary to ensure that a child's needs are met. The law requires parents to overcome obstacles. Father's employment was an obstacle he was simply not willing to overcome.

## CONCLUSION

In conclusion, clear and convincing evidence exists to establish grounds for termination of Father's parental rights under 23 Pa.C.S. §§2511(a)(1), (2), (5), and (8). Moreover, the evidence presented at the TPR hearing also supported this Court's changing of the children's permanency goal from reunification to adoption. Accordingly, we respectfully request the Superior Court affirm the termination of Father's parental rights and our changing of the permanency goal, and dismiss the instant appeals.